UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KAREN CARR, | CASE NO. C23-5252 MJP |
| Plaintiff, | ORDER GRANTING |
| v. | DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| SPINNAKER INSURANCE COMPANY, | |
| Defendant. | |

This matter comes before the Court on Defendant's Motion for Summary Judgment. (Dkt. No. 15.) Having reviewed the Motion, Plaintiff's Opposition (Dkt. No. 17), the Reply (Dkt. No. 27), and all supporting materials, the Court GRANTS the Motion.

## BACKGROUND

Plaintiff Karen Carr claims that her insurer, Defendant Spinnaker Ins. Co., wrongly denied her claim for coverage for damage caused to her house by a painter. Carr pursues breach of contract, bad faith, and Insurance Fair Conduct Act claims. The Court reviews the relevant facts.

1    Carr purchased a vacation home in Sekiu, Washington in October 2021, and obtained a

2 homeowner's policy from Spinnaker in November 2021. (Declaration of Karen Carr ¶¶ 2, 4-5

3 (Dkt. No. 18).) The policy provides coverage for the dwelling and personal property. (Ex. 1 to

4 Carr Decl. (Dkt. No. 18 at 59-60).) The Policy provides coverage for "direct physical loss" to the

5 dwelling and other structures (Coverage A and B) and to personal property (Coverage C). (Ex. 1

6 to the Carr Decl. (Dkt. No. 18 at 58).) The Policy contains certain exclusions, two of which are

7 relevant. First, the Policy excludes coverage for the dwelling if the loss was caused by:

8       Vandalism and malicious mischief, and any ensuing loss caused by any intentional and
        wrongful act committed in the course of the vandalism or malicious mischief, if the
9       dwelling has been vacant for more than [60] consecutive days immediately before the
        loss. A dwelling being constructed is not considered vacant;

10
11 (Dkt. No. 18 at 67 (as amended by Endorsements (Dkt. No. 18 at 92).) The policy does not

11 define "vandalism" or "malicious mischief."

12    Second, the dwelling and personal property coverage excludes any "loss to property . . .

13 caused by any of the following":

14
15       3. Faulty, inadequate or defective:
            a. Planning, zoning, development, surveying, siting;
16          b. Design, specifications, workmanship, repair, construction, renovation,
            remodeling, grading,
16          compaction;
17          c. Materials used in repair, construction, renovation or remodeling; or
            d. Maintenance;
18       of part or all of any property whether on or off the "residence premises".

19 (Dkt. No. 18 at 72-73.) This exclusion is found in a portion of the policy entitled "Section I –

20 Exclusions," and it applies to the dwelling and personal property coverages. (Id. at 58, 70.)

21    After Carr purchased the home, she sought a painter to refresh the interior paint.

22 (Deposition of Karen Carr at 58.) Carr posted a request for a painter on Facebook and received a

23 response from David Scott, who identified himself as a licensed and bonded painter. (Carr Dep.

24

1    at 68-69; Ex 2 to the Declaration of Eliot Harris (Dkt. No. 16-2 at 3).) Carr asked Scott to paint

2    the walls, ceilings, and kitchen cabinets. (Dkt. No.  16-2 at 7, 10, 27.) Carr also told Scott that

3    she would be replacing the floors everywhere except the living room and kitchen, and that Scott

4    would not have to protect those floors while painting. (Dkt. No. 16-2 at 9, 37-38.) Carr then

5    signed the $6,633.00 bid contract and paid half of the contract price up front. (Carr Dep. at 95;

6    Carr Decl. ¶ 25 (Dkt. No. 18 at 10).)

7         Scott and two others began work in early December, while Carr's sons and another

8    handyman were present at the home. (Dkt. No. 16-2 at 33-35, 37; Deposition of David Scott at

9    21, 23.) After three days of work, Scott was nearly finished and asked for payment of all but ten

10   percent of the total contract. (Dkt. No. 16-2 at 44-45.) Since Carr could not visit the home, Scott

11   sent videos and photos of the progress. (See Dkt. No. 16-2 at 45-49.) Carr expressed her

12   excitement about the work based on what she could see through the photos and videos, and paid

13   $1,500. (Id.) Carr also asked Scott if he would refinish the hardwood floors when he was

14   finished painting. (Dkt. No. 16-2 at 47.)

15        When Carr visited the home a few days later, she was concerned with some touch-up that

16   needed to be done and some other issues concerning the cabinets. (Dkt. No. 16-2 at 60.) Her

17   enthusiasm for the quality of Scott's work evaporated. Carr pointed out the lack of primer and

18   failure to prep properly, among other issues. (Dkt. No. 16-2 at 67.) Meanwhile, Scott blamed

19   most of the paint issues on the other contractors who were at the house, but offered to fix some

20   of the damage for additional money. (Scott Dep. at 33; Dkt. No. 16-2 at 61, 69-72.) Carr refused

21   to pay the balance she owed on the original contract, and Scott threatened to put a lien on the

22   home. (Scott Dep. at 16, 18-29, 32-33; Dkt. No. 16-2 at 72.) Carr investigated Scott's claim that

23   he was licensed and bonded and determined that he had misled her on both fronts. (Carr Dep. at

24

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 3

162-69.) She then filed a police report with the Clallam County Sheriff's Department and filed a report with the Washington Department of Labor & Industries. (Carr Dep. at 26; Carr Decl. Exs. 9 & 10.)

Several days after inspecting Scott's work, Carr reported to Spinnaker that Scott had "vandalized" her home and sought insurance coverage. (Harris Decl. Ex. 5.) Carr told Spinnaker that there were "general damages," and that Scott had ruined her floors, doors, and windowsills, and trim, as well as the cabinets. (Harris Decl. Ex. 5 (Dkt. No. 16-5 at 4).) Spinnaker denied the claim for coverage, stating that the loss was caused by faulty workmanship, which is excluded under the policy's "Section I – Exclusions" which applies to loss to the dwelling and personal property. (Harris Decl. Ex. 7 (Dkt. No. 16-7).)

Carr then filed suit and pursues claims for breach of contract, bad faith, and violations of IFCA. Spinnaker moves for summary judgment.

## ANALYSIS

**A.    Legal Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

1    Once the movant has met this burden, the nonmoving party then must show that there is a

2    genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the

3    existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

4    matter of law." Celotex, 477 U.S. at 323-24.

5    **B.      Spinnaker's Proper Denial of Coverage**

6            The undisputed facts show that Spinnaker owes no coverage duty under the Policy to

7    cover the claimed loss.

8            Under Washington law, Courts construe insurance policies as they contracts, "us[ing] the

9    same interpretive techniques employed on other commercial contracts." Int'l Marine

10   Underwriters v. ABCD Marine, LLC, 179 Wn.2d 274, 282 (2013). "In construing insurance

11   contracts, our principal function is to determine the parties' intent by examining the contract as a

12   whole." Mid-Century Ins. Co. v. Henault, 128 Wn.2d 207, 213 (1995). "Insurance contracts are

13   construed in accordance with the meaning understood by the typical purchaser of the insurance."

14   Sprague v. Safeco Ins. Co. of Am., 174 Wn.2d 524, 528 (2012). "When we construe the

15   language of an insurance policy, we give it the same construction that an 'average person

16   purchasing insurance' would give the contract." Woo v. Fireman's Fund Ins. Co., 161 Wash.2d

17   43, 52, 164 P.3d 454 (2007) (citation and quotation omitted). Unless there is ambiguity—

18   meaning a provision is susceptible to two different interpretations—the Court will enforce the

19   clear policy language. See McLaughlin v. Travelers Comm'l Ins. Co., 196 Wn.2d 631, 642

20   (2020). If ambiguity exists, the Court will "adopt the definition that most favors the insured." Id.

21   "Undefined terms are to be given their plain, ordinary, and popular meaning." Xia v. ProBuilders

22   Specialty Ins. Co., 188 Wn.2d 171, 181–82 (2017), as modified (Aug. 16, 2017) (citation and

23

24

1   quotation omitted). "However, where the policy language is clear and unambiguous, this court

2   will not modify the contract or create ambiguity where none exists." Id. at 182.

3        The record here unambiguously demonstrates that the claimed loss arises out of faulty or

4   defective workmanship, which is excluded from coverage. Carr does not argue that the policy

5   exclusion for faulty or defective workmanship is ambiguous, and the Court finds no such

6   ambiguity. So while the Policy does not define "faulty" or "defective," their common

7   understanding is clear. The word "faulty" means "marked by fault or defect: IMPERFECT,"

8   while "defective" means "having a defect or flaw : imperfect in form, structure, or function."

9   Faulty, Merriam-Webster Dictionary, available at https://www.merriam-

10  webster.com/dictionary/faulty; Defective, Merriam-Webster Dictionary, available at

11  https://www.merriam-webster.com/dictionary/faulty (last visited May 13, 2024). Here, the

12  undisputed record shows evidence of only defective or flawed workmanship. Though Carr was

13  initially pleased with Scott's work, when she saw it in person, she found missing primer, drips,

14  and flaws in the paint surface, as well as overspray in various parts of the home. All of these

15  flaws fall squarely within the Policy's Section I - Exclusion for a "loss to property . . . caused by

16  . . . [f]aulty, inadequate or defective . . . workmanship, repair, construction, renovation, [or]

17  remodeling . . . ." (Dkt. No. 18 at 72-73.) The problems that Carr has identified are the kinds of

18  things that might reasonably happen during a painting project and which reasonable fall within

19  the definition of both defective and faulty. While the extent of the overspray in this case may be

20  unusual and reflect sloppiness in Scott's work, it, at most, amounts to imperfect work. The Court

21  finds that Spinnaker correctly determined that it owed no duty of coverage under the Policy.

22        The Court rejects Carr's claim that the damage here was the result of vandalism or

23  malicious mischief—losses from which remain covered under the Policy. The terms "vandalism"

24

1    and "malicious mischief" are undefined, but Washington courts have previously interpreted these

2    same terms. See Bowers v. Farmers Ins. Exch., 99 Wn. App. 41, 45 (2000), as amended on

3    reconsideration (Mar. 7, 2000). As the Court in Bowers explained, vandalism means "'willful or

4    malicious destruction or defacement of things of beauty or of public or private property'" while

5    malicious mischief means "'willful, wanton, or reckless damage or destruction of another's

6    property.'" Id. (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1367,

7    2532 (1993)). To fall within either provision, "'the damage [must] result[] from an intentional act

8    from which damage was reasonably expected to result.'" Id. (quoting Frontier Lanes v. Canadian

9    Indem. Co., 26 Wn. App. 342, 347 (1980) overruled on other grounds by Graham v. Pub.

10   Employees Mut. Ins. Co., 98 Wn.2d 533, 538 n.2 (1983)).

11        The record presented to the Court remains devoid of any evidence that Scott's defective

12   paint work might qualify as vandalism or malicious mischief. First, the Court notes that Scott

13   testified that he did not intend to cause any harm, and that he blamed many of paint-related

14   defects on the other individuals in the house to damage the paint before it dried. (Scott Dep. at

15   36.) Second, none of the evidence Carr cites to might support a finding of vandalism and

16   malicious mischief. (See Pl. Opp. at 13.) Carr relies exclusively on four declarations: (1) from

17   Carr; (2) Carr's husband; (3) Carr's son; and (4) Carr's neighbor. (Id.) The Court reviews all four

18   and highlights the reasons why they do not identify material facts in dispute.

19        First, Carr claims that Scott "intentionally and recklessly" sprayed paint on "the floor," a

20   ceiling fan, tools, door frames, bathroom floors, cabinets, dishes, and curtains. (Carr Decl. ¶ 35.)

21   This self-serving declaration merely puts a gloss on the underlying evidence without identifying

22   any specific evidence that Scott intentionally spraypainted to damage, destroy or deface the

23   property. More importantly, the declaration is contradicted by the communications between Carr

24

1    and Scott at the time of the painting. Carr claims that Scott damaged carpeted and vinyl floors.

2    (See Carr Decl. ¶ 35 & Exs. 5-7.) But before Scott began work, Carr specifically told Scott that

3    "[w]e will be replacing floors and trim" and that she would only "keep the hardwoods in living

4    room and kitchen but everything else will be replaced." (Dkt. No. 16-2 at 9.) She also told Scott

5    she was "replacing the vinyl in all the bathrooms" and confirmed mid-project that she was "[s]till

6    ripping [the carpets] out." (Dkt. No. 16-2 at 37, 38.) And when Scott sent her the same picture of

7    the cabinet doors on a carpeted floor with substantial overspray on the carpet that Carr now

8    claims shows "vandalism," Carr voiced no concern. (Dkt. No. 16-2 at 41.) These

9    contemporaneous communications undermine Carr's declaration and its veracity. And while the

10   Court has no reason to doubt that Scott got paint on the other items, there is no evidence of

11   intentionality. Carr's argumentative and speculative assertions do not suffice to raise a dispute of

12   fact. See Anheuser-Busch, Inc. v. Nat. Beverage Distributors, 69 F.3d 337, 345 (9th Cir. 1995)

13   (noting that "conclusory or speculative testimony is insufficient to raise a genuine issue of fact to

14   defeat summary judgment").

15          Second, none of the other three declarations provide objective evidence from which a

16   jury could find Scott engaged in vandalism or malicious mischief. Carr's husband states "I can

17   say, without a doubt, that what David Scott did was either intentional or extremely reckless, and

18   that he absolutely caused damage to the Sekiu home by spray painting carpeted floors; spray

19   painting curtains; spray painting a ceiling fan, spraying inside cabinets, spraying tiled floors and

20   spraying and ruining our tools." (Declaration of Shelton Carr ¶ 11.) Carr's son similarly provides

21   his gloss on the nature of the work—"[i]t wasn't just the worst paint job I've seen, it appeared to

22   be an intent to destroy things (or having no care in the world and not caring what or where you

23   sprayed)." (Declaration of Zachary Vandersluis ¶ 7.) And Carr's neighbor similarly claims he

24

1    "would describe [Scott's work] as so reckless that it was intentional" and that ""it really looked

2    like kids had come in and vandalized parts of the house." (Declaration of Byron Bjerke ¶¶ 16-

3    17.) He claims that "[i]t was as if this guy just came in and sprayed paint everywhere without

4    masking and without caring what was sprayed." (Id. ¶ 18.) While these declarations are strong on

5    rhetoric, they thin on objective facts or references to specific damage that might allow a jury to

6    conclude that Scott intended to cause harm and damage the home, particularly when placed in

7    the context of Carr's contemporary instructions to Scott and Scott's own testimony about the

8    work. The Court finds that none of these conclusory and speculative declarations raises a

9    sufficient dispute of fact that might support Carr's theory that the damage was caused by

10   vandalism or malicious mischief and is therefore covered by Policy.

11        The Court also notes that facts here are far different from those in the sole case on which

12   Carr relies—Graff v. Allstate Ins. Co., 133 Wn. App 799 (2002)—where there was evidence of

13   vandalism or malicious mischief. In Graff, the court found evidence of vandalism where the

14   landlord sought coverage for damage caused to his home by tenants who used it as an indoor

15   methamphetamine lab. The Court found that the tenant had engaged in intentional acts without

16   regard for the landlord's property interest and "the resulting damage was almost a certainty." Id.

17   at 806. The same cannot be said of Scott's work. First, he undertook the painting for the benefit

18   of Carr and at her direction, at least with regard to the floors. Unlike in Graff where the tenants

19   had no permission to run an indoor meth lab, Scott had been invited into the home to paint.

20   Second, there is no evidence that Scott intended to do harm to the home. At most, the evidence

21   shows carelessness, but not intentional acts that might support a finding of vandalism.

22        The Court also notes that the fact Scott misled Carr about being licensed and bonded does

23   not impact the question of whether he intended to cause damage to the home. The fact that Scott

24

misled Carr strongly suggest an intent to dupe Carr into hiring him to do the job and receive

payment. It does not support a finding that he intended to do harm to the house. The lack of

bonding and licensing does not necessarily mean the painter is engaged in vandalism. At most,

these facts would support a claim of fraud against Scott, but they do not show that he intended to

damage the home.

The Court here finds that Spinnaker is entitled to summary judgment on all three claims.

Given that Spinnaker properly denied coverage and therefore did not breach the contractual

obligations in the policy, Carr cannot pursue her extracontractual claims. See Perez-Crisantos v.

State Farm Fire & Cas. Co., 187 Wn.2d 669, 680-84 (2017) (noting that IFCA creates a cause of

action for the unreasonable denial of coverage, and holding that violations of the insurance

regulations alone will not provide a right of action under IFCA); Smith v. Safeco Ins. Co., 150

Wn.2d 478, 484 (2003) (explaining that a bad faith claim requires evidence the insurer breached

the insurance contract). As such, the Court GRANTS the Motion and enters summary judgment

in Spinnaker's favor on all claims.

## C.   No Reason for Additional Discovery

Carr submits a request under Rule 56(d) for additional time to oppose the summary

judgment motion. The Court rejects this request.

Rule 56(d) "provides a device for litigants to avoid summary judgment when they have

not had sufficient time to develop affirmative evidence." United States v. Kitsap Physicians

Serv., 314 F.3d 995, 1000 (9th Cir. 2002). Under Rule 56(d), if the nonmoving party "shows by

affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its

opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain

affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R.

1    Civ. P. 56(d). In order to prevail under Rule 56(d), the party opposing summary judgment must

2    make " '(a) a timely application which (b) specifically identifies (c) relevant information, (d)

3    where there is some basis for believing that the information sought actually exists.'" Emp'rs

4    Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox, 353 F.3d 1125, 1129 (9th Cir.

5    2004) (quoting VISA Int'l Serv. Ass'n v. Bankcard Holders of Am., 784 F.2d 1472, 1475 (9th

6    Cir. 1986)). The Ninth Circuit has held a Rule 56(d) continuance "should be granted almost as a

7    matter of course unless the non-moving party has not diligently pursued discovery of the

8    evidence." Burlington N. Santa Fe R.R. Co. v. The Assiniboine & Sioux Tribes of the Fort Peck

9    Reservation, 323 F.3d 767, 773–74 (9th Cir. 2003) (internal quotation marks and citations

10   omitted).

11         Carr has failed to identify sufficient grounds for an extension under Rule 56(d). Carr

12   claims that she should be given additional time to depose Scott because he invoked his Fifth

13   Amendment right on several topics and she was unable to develop testimony on five topics. Of

14   these five, only one topic relates to facts material to the Motion for Summary Judgment—"all of

15   the damage that Scott caused (room by room, picture by picture, frame by frame) including his

16   'intent.'" (Pl. Opp. at 5.) Such questions might develop testimony about whether Scott intended

17   to cause any damage to the home through his painting work. But the Court finds additional

18   testimony would not be fruitful. Scott already testified that he did not intend to cause any

19   damage to the house. (Scott Dep. at 36.) Moreover, Carr identifies no reason why he did not ask

20   these questions during Scott's deposition. Counsel asked Scott about his licensing and bonding,

21   and once he encountered Scott's fifth amendment invocation, stated: "we're going to reschedule

22   this and I will end up getting some rulings on some of these objections and then we'll, um, tackle

23   it from there." (Scott Dep. at 46-47.) The deposition transcript shows that Carr's counsel never

24

1   asked a question about the paint work or damage and therefore did not know whether Scott

2   would answer such questions or not. More importantly, the requested extension reflects a

3   complete lack of diligence on counsel's part, which is fatal to the request. See Burlington, 323

4   F.3d at 773–74. Carr took Scott's deposition on February 21, 2024, and she has never asked the

5   Court to rule on Scott's objections or to grant leave to continue the deposition beyond the

6   discovery deadline. Carr only raised the issue in opposing Spinnaker's Motion in late March.

7   This reflects a lack of diligence. Lastly, the Court remains unpersuaded that Spinnaker's

8   counsel's notice of unavailability excuses Carr's inaction. As the Local Civil Rules make clear, a

9   notice of unavailability "do[es] not alter dates set by the Court or civil rules" and that a notice

10   "does not preclude an attorney from requesting relief from a deadline due to a scheduling

11   difficulty." Local Civil Rule 83.2(c). The Court DENIES the request for an extension.

12   **D.    No Basis to Strike Motion**

13       Carr requests the Court strike Spinnaker's Motion because it was filed during one of the

14   periods of Spinnaker's counsel's unavailability. This argument has no merit. As explained above,

15   notices of unavailability have no legal effect. They do not prevent parties or the Court for taking

16   action. They are, as the name suggests, mere notices. They do not serve as grounds to limit a

17   party's ability to request relief of Court and they do not excuse compliance with the Court's

18   scheduling order or any obligations under the Federal and Local Civil Rules. The Court DENIES

19   the request to strike.

20                  **CONCLUSION**

21       Carr has failed to identify a genuine issue of material fact in dispute that might support

22   her claim for coverage and her dependent extra-contractual claims. Rhetoric aside, there is no

23   evidence in the record to allow the fact finder to conclude Scott's paint work fit within the

24

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 12

Policy's coverage for vandalism or malicious mischief. Construed in Carr's favor, the facts only show that Scott performed faulty work, which is expressly excluded from coverage. Spinnaker's denial of coverage was therefore proper and all three claims cannot proceed. The Court GRANTS Spinnaker's Motion and directs entry of judgment in its favor on all claims.

The clerk is ordered to provide copies of this order to all counsel.

Dated June 4, 2024.

Marsha J. Pechman
United States Senior District Judge